# In the United States Court of Federal Claims

No. 16-44C
(Originally Filed: March 21, 2016)
(Re-filed: April 5, 2015)[1]

* * * * * * * * * * * * * * * * * * * *

STARRY ASSOCIATES, INC.

        *Plaintiff*,

v.

THE UNITED STATES,

        *Defendant*.

* * * * * * * * * * * * * * * * * * * *

Bid Protest; Assertions of Bias; Supplementation of the Administrative Record.

*Lars E. Anderson*, Reston, VA, with whom was *James Y. Boland*, Tysons Corner, VA, for plaintiff.

*Alexis J. Echols*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Douglas K. Mickle*, Assistant Director. *Christian Maimone*, Office of General Counsel, U.S. Department of Health and Humans Services, of counsel.

## OPINION AND ORDER

Pending in this protest of a Department of Health and Human Services' decision to cancel a solicitation is plaintiff's motion to supplement the administrative record with four depositions it seeks leave to take. Defendant opposes the motion and asks to supplement the record with two documents of its own. The motion is fully briefed, and oral argument was held telephonically on March 18, 2016. Because plaintiff makes credible

---

[1] This opinion was originally issued under seal pursuant to the protective order entered in this case. The parties conferred and proposed appropriate redactions of protected information. Those redactions are indicated herein with brackets.

allegations that the decision to cancel the solicitation was tainted by bias, we grant plaintiff's motion to take limited discovery to supplement the record.

BACKGROUND

I.  General Background And Procurement History

The Department of Health and Human Services ("HHS") Program Support Center ("PSC") issued Request for Quotations No. 15-233-SOL-00023 ("RFQ" or "solicitation") on November 13, 2014.  The procurement was set aside for small businesses and was to be awarded to the lowest priced, technically acceptable offeror.  Through the solicitation, PSC sought to procure a range of business operations services which would support PSC's implementation of HHS's Unified Financial Management System ("UFMS"). Plaintiff, Starry Associates, Inc. ("Starry"), is the incumbent provider of on-site operational support for UFMS.

UFMS is built on a backbone of commercial software known as Oracle Federal Financials, part of the Oracle E-Business Suite.  The RFQ thus required key personnel to have experience with that software as well as with UFMS.  The agency was also looking for expertise regarding several of its other systems that worked in coordination with UFMS: the Managing Accounting and Credit Card System ("MACCS"), a system for accounting purchases made by government credit card holders, and GovNet-NG, a reporting system used to distribute operational reports.  *See* Administrative Record ("AR") 54-55. Both MACCS and GovNet-NG are proprietary systems developed by Starry and are licensed to HHS.  AR 48.

Three companies timely submitted quotations.  The lowest priced bidder, Intellizant, LLC ("Intellizant") offered a total price of $15,204,633.60 over five years.  As the low-priced bidder, it was evaluated for technical acceptability along with past performance and Section 508 Compliance.[2]  The acquisition plan called for the initial technical evaluation to be performed by the Technical Evaluation Panel ("TEP").  The TEP was comprised of three individuals: [            ], [         ], and [              ]. [

---

[2] "Section 508" refers to section 508 of the Rehabilitation Act of 1973, which requires that federal agencies provide software and website accessability to disabled persons.

2

] and [         ] are referred to in the AR as "certified by the COR."³ AR 593. The TEP received the three proposals by email on November 26, 2014.

The TEP sent its completed evaluation to the Source Selection Authority ("SSA") on December 3, 2014. The evaluation was not unanimous. [       ] and [         ] found Intellizant to be acceptable–although [.       ] did note information missing from Intellizant's proposal–for all three factors, but [         ] rated Intellizant technically unacceptable. AR 559 ([         ]'s evaluation sheet).

The SSA, Cassandra Ellis, who is also the Contracting Officer ("CO") for this procurement and resulting contract, after considering the TEP assessment, evaluated Intellizant's proposal herself and determined that Intellizant was technically acceptable. *See* AR 594 (Award Decision Document). She listed some of the concerns from the TEP: "minimal detail or omission of detail regarding performance metrics, minor computation errors and [lack of] specific detail regarding the accomplishment of the knowledge transfer." *Id.* She found, however, that those concerns could be "easily [] addressed at the time of award, and do not outweigh the strengths of the technical aspects of Intellizant's quote. The computational errors were corrected in the second revision of Intellizant's quote." *Id.* She also found that Intellizant had experience with the "existing software" and with "Oracle R12 which will be implemented in the coming fiscal year." She thus awarded the contract to Intellizant on December 18, 2014.

Starry was notified of the award the same day. It had an evaluated price of [         ] but was not evaluated for other factors because Intellizant was found to be technically acceptable. Plaintiff filed a protest at the Government Accountability Office ("GAO") on December 29, 2014. Starry alleged that the agency's evaluation of Intellizant was unreasonable because of Intellizant's lack of experience with the contract requirements and lack of qualified key personnel.

---

³"COR" stands for Contracting Officer's Representative. The AR is not clear what the importance is of being certified by the COR other than that the CO saw fit to mention it in the award decision document.

On January 6, 2015, HHS informed GAO and Starry of its intent to take corrective action. After inquiry from GAO, HHS explained that it did "not intend to reevaluate the requirement or solicit new proposals." AR 715. Instead, the agency represented that the protest had "revealed certain gaps in the record" that needed to be filled, and thus it intended to "thoroughly review the contract file and ensure that the evaluation is complete, accurate, and fully consistent with the requirements of the RFP." *Id.* GAO dismissed the protest as academic on January 7, 2015.

In response to what it believed to be an insufficient scope of corrective action, Starry sent a letter to the Clerk of Court of this court, stating its intent to file a bid protest. On January 9, 2015, the CO sent a letter to Starry indicating that the agency now intended to reevaluate proposals and make a new award decision. AR 718. That representation prompted Starry to withdraw its notice of intent to protest here.

Unlike the first evaluation, which took only two or three business days, the TEP's second evaluation lasted from January 16, 2015 to April 28, 2015. It issued its new report on April 29, 2015. The TEP was once again unable to reach a consensus because one of its members again rated Intellizant as unacceptable for the technical factor. There is virtually no contemporary documentation of that process, and the record does not contain individual reports of the TEP members concerning the reevaluation.

The SSA's report and second award determination stated the minority and majority evaluators' views as to the three main facets of the technical proposals: 1) Functional Knowledge Transfer and Training; 2) Monthly, Quarterly, and Year-End Processing Support; and 3) Minimum Resource Requirements. For each area, the CO agreed with the majority's evaluation and found Intellizant to be technically acceptable. She thus concluded that award should be made to Intellizant as the lowest priced, technically acceptable offeror. Offerors were notified of that result the same date as the report, April 30, 2015.

On May 5, 2015, Starry filed another protest at GAO, once again challenging the award on the basis of Intellizant's alleged lack of experience and lack of qualified key personnel. Starry also alleged bias in the PSC's director of accounting services, Mr. John Davis, who Starry alleged exerted influence to guide the award to Intellizant

GAO held a hearing on July 15, 2015, and took testimony from the CO. Starry was, however, precluded from examining Ms. Ellis regarding its allegation of bias. On August 11, 2015, GAO sustained the protest in part and denied it in part. GAO found that the SSA failed to "evaluate whether the personnel proposed by Intellizant were capable of performing the PWS [Performance Work Statement] tasks" and "failed to evaluate whether Intellizant could provide the personnel necessary to meet the solicitation's requirements." AR 1129 (first GAO decision); *Starry Assocs., Inc.*, B-410968.2 , 2015 CPD ¶ 253 (Comp. Gen. Aug. 11, 2015). GAO found the allegations of bias to be "without merit" based on Mr. Davis' assertion that he had recused himself from the procurement process. AR 1130. GAO concluded by recommending reevaluation of the proposal in accordance with the RFQ's stated PWS and key personnel criteria, adequate documentation of that evaluation, and, if the agency found Intellizant to be lacking, to terminate the award and evaluate the next-in-line offeror. AR 1130-31.

The record is then largely silent until September 8, 2015, when counsel for HHS informed GAO and Starry that it intended to cancel the solicitation rather than reevaluate Intellizant. Counsel emailed the parties and GAO the following explanation:

> Specifically, it has been determined that two of the three systems proposed to be supported under the instant procurement were included in the solicitation by error. That is, both MACCS and GovNet-NG are the subject of separate license agreements with Starry Associates which allow the agency to make use of those proprietary systems. Included in those license agreements are support provisions; and, after review, the agency has determined that it better suits the government's needs to have the contract support and license agreements bundled together, rather than including the support function in a separate multi-faceted support contract. Indeed, my client informs me that the MACCS license agreement will be renewed before the end of September 2015, and the GovNet-NG license agreement was renewed n May 2015.

Def.'s App. 1.[4]  The agency thus concluded that it would "cancel the instant solicitation, redraft the statement of work to better match its current needs, and re-solicit in Fiscal Year 2016." *Id.*

On September 15, 2015, Starry filed its third protest at GAO, challenging HHS's decision to cancel the solicitation as a pretext so that Mr. Davis could secure future work for Intellizant.  Plaintiff argued that Davis decided to eliminate the requirements of the solicitation as to which Intellizant was unqualified and later to re-solicit the remaining work in order to avoid GAO's earlier recommendation to reevaluate, which Starry believes would have resulted in it winning the original procurement.  GAO denied the protest by written decision on December 23, 2015, finding that the agency's proffered rational for cancellation was reasonable.  Thus, even crediting the allegations of bias, the result was not affected, in GAO's view, because the "cancellation was otherwise reasonably justified." AR 1254.

II. Evolution Of The Agency's Need

The underlying procurement documentation is largely silent as to the evolution of the agency's view of its needs vis-a-vis the RFQ.  The record now, however, contains two additional declarations submitted to GAO by the agency after plaintiff's third protest there.

The first is from Mr. Davis and is dated October 8, 2015.  In it, he avers that he was asked by the COR for the MACCS and GovNet-NG license agreements to sign off on their renewals.  The GovNet-NG renewal was in May 2015, and the MACCS contract was up for renewal in September 2015. The request regarding the MACCS contract specifically is what Mr. Davis says triggered his conclusion that the UFMS procurement should not have included support for these systems because those services were already covered by separate contracts.  *See* AR 1243.  He also stated that the UFMS system and the two proprietary Starry systems "do not talk with each other" and thus were not very integral to supporting UFMS.  *Id.*  There was thus no need to pay for extra support for those systems under the UMFS contract, according to Mr. Davis.  *Id.*  That being the case, he concluded that it was unnecessary to

---

[4] This document was attached to the government's opposition to plaintiff's motion to supplement the administrative record.  The government represents that it should have been included in the record.

reevaluate Intellizant and decided a better course was to cancel the solicitation and re-solicit only those services needed as part of the UFMS effort. AR 1244. We note, however, that, as plaintiff points out, the duplication between the proprietary systems' license agreements and the UFMS contract should have been apparent in May 2015, when the GovNet-NG contract was renewed.

The second declaration is from Mr. Patrick Joy, the interim Head of Contracting Activity and Competition Advocate at PSC. It is dated October 13, 2015. Mr. Joy declared that removing the two proprietary-related items from the UFMS contract would promote competition. AR 1245. Although that logic-leap is unexplained, presumably he concluded that the removal of an expertise requirement regarding two pieces of proprietary software would, at least hypothetically, result in a larger pool of qualified offerors. He also records in his declaration that he was told that the work regarding the two proprietary systems was only incidental to the overall effort. He does recognize in his statement that MACCS and GovNet-NG allow the agency to better use Oracle software, but also notes that neither is directly built into it and that the agency could use other tools. *Id.* Further, he stated that PSC is phasing out the GovNet system to be replaced by a non-proprietary Oracle program. *Id.* The Joy declaration also notes in bullet points several additional relevant facts, including that:

> 3. Verbal communication consisted of requests for the Program to determine a course of action in relation to the loss of the GAO Protest and reminders that that determination was due.
>
> . . .
>
> 5. At no time did the Program Office or Contracting Office discuss or contemplate re-evaluating Intellizant's proposal either before or after the GAO decision was issued in August of 2015.
>
> . . .
>
> 7. John Davis . . . received a request to renew the contract for Starry for the MACCS license and support . . . . This triggered a memory that MACCS support had also been included in the Statement of Work (SOW) for the UFMS acquisition. He was asked and was told that GOVNET-NG was also proprietary to Starry Associates and was covered under a separate license and

> support contract, but that it has also been included in the UFMS statement of work. When he asked his staff why they were included in more than one contract, he was told that is what we have always done.
>
> 8. I saw John Davis at some point (unsure of actual date but before GAO issued a decision on August 11, 2015) in passing. He informed me generally of the above facts and said that the [PSC], Financial Management Portfolio wished to re-write the Statement of Work to remove the duplicative work. I told John Davis to hold off on any actions since a GAO decision was due soon. Our course of action would be dependent on the decision of the GAO.

AR 1245-46. The bullet points go on further to reflect that, after GAO reached its August 11 decision, Joy forwarded all of this information to his "leadership" to "keep them informed and to try to coordinate a decision on process forward." AR 1246. Discussions via email and a conference call were held during the next several days. The Program Office indicated to Mr. Joy that it wanted to cancel the solicitation and rewrite the Statement of Work.[5] *Id.*

III. Allegations Of Bias

Plaintiffs allege that this procurement was tainted from its inception by the undue influence of Mr. John Davis, who serves as Accounting Services Division Manager at PSC. Mr. Davis was employed by Intellizant immediately prior to joining PSC, during which time he was involved in Intellizant's unsuccessful effort to secure the incumbent contract for UFMS support. Plaintiff won and has performed that contract. During his employment at Intellizant, Mr. Davis was also involved in unrelated work for HHS. Plaintiff alleges that Mr. Davis continues to be personal friends with the president and CEO of Intellizant.

Mr. Davis joined HHS PSC in August 2010. Plaintiff alleges that, since Mr. Davis began at HHS, Intellizant has received 57 contract awards, totaling

---

[5] We are not clear on whether the reference to "Program Office" refers to the PSC or a component of it.

over $12.5 million.  43 of these contracts were sole-source awards, which were worth $5,227,315.  Plaintiff further alleges that, prior to Mr. Davis' inception at HHS, Intellizant won only $98,233 in contracts from HHS.  Given his history with Intellizant and its past effort to win the predecessor contract, Mr. Davis purported to recuse himself from the solicitation.  AR 940 ("I recused myself from this procurement because I am a former employee of Intellizant.")

Mr. Davis is the supervisor of [        ], who was the COR for the incumbent UFMS contract.  [        ] prepared the PWS for the current solicitation.  In a signed statement prepared for the GAO, he represented that Mr. Davis "highly recommended" that he recuse himself from the TEP due to his involvement with the incumbent UFMS contract.  AR 957.  After Starry's first protest, [        ] offered to once again be part of the TEP, but Mr. Davis told him that it "would not look good."  *Id.*  Instead, the TEP was, according to [        ], made up of individuals selected by Mr. Davis.  *Id.*  Plaintiff alleges that Mr. Davis asked him to recuse himself because of [        ]'s consistent positive performance feedback during the incumbent contract performance, of which Mr. Davis was aware.  [        ] also states that Mr. Davis asked him to give Starry negative feedback.  AR 958.  His refusal to comply with that request has caused friction in their relationship, according to [        ].  *Id.*  Finally, [        ] stated that he was instructed by Mr. Davis several times to prepare for a change in vendor and that Mr. Davis represented that Intellizant would be much better "than what we have today" as far as UFMS support.  *Id.*

Internal correspondence between [        ] and Mr. Davis reveals that [        ] inquired of Mr. Davis who and how many persons should make up the TEP.  Mr. Davis recommended a panel of three and recommended three names, one of whom, [        ], was eventually part of the TEP.  AR 1535-36.  [        ] responded that there should be at least "one person with UFMS experience," and further recommended that Mr. Davis, [        ], and [        ] comprise the TEP.  AR 1534-35.  He also offered his own services if Mr. Davis felt that appropriate.  Mr. Davis replied that he should be replaced by [        ] or Ed Jackson, both of whom he stated were aware of the contract effort.  The record is not clear how the final composition of [        ], [        ], and [        ] was reached.

[        ] was the COR for Intellizant's other unrelated contract with HHS.  On November 21, 2014, she prepared a past performance questionnaire for Intellizant on that contract and submitted it to Megan Kisamore, the

9

Contract Specialist for the UFMS solicitation. She rated Intellizant as "exceptional" in every category and stated that she "definitely would" award another contract to Intellizant. AR 313. In a signed statement submitted as part of the agency's report to GAO, she stated that she was unaware of any involvement by Mr. Davis with the subject procurement and has very little day-to-day contact with him. AR 965. She did, however, inquire of Mr. Davis after [      ] questioned her involvement in the TEP because she had just completed a past performance questionnaire for Intellizant on its other contract. She reported that Mr. Davis assured her that it was alright for her participate and thanked her for her willingness to do so. *Id.*

On November 26, 2014, [          ] questioned [       ]'s involvement given the revelation that Intellizant was the lowest priced offeror and that [       ] had just previously submitted a past performance questionnaire for Intellizant. AR 1449. He did not question her integrity in fact but only whether she would appear as biased. [       ] responded that it was "not [her] call" and that she was asked the day before by [       ] "per the direction of John Davis." AR 1448. She suggested that she be replaced by Mr. Jackson and further directed [       ] to inquire of Mr. Davis. *Id.* Instead, [        ] relayed those same concerns to Ms. Kisamore, who in turn relayed them to Ms. Ellis, the CO. Nine minutes later, Ms. Kisamore replied back to [       ] that the CO had cleared [       ]'s involvement. AR 1472-73 ("there is no issue"). [       ] then forwarded the entire chain of emails regarding her involvement to Mr. Davis with the following encapsulation: "FYI – no more concerns," which was followed with a smiley face emoticon. AR 1523. The record contains no indication of the context for [       ]'s forwarding of that email chain to Mr. Davis. Plaintiff, naturally, alleges that the two must have colluded during the procurement process to award to Intellizant, and, at a minimum, that it reflects that Mr. Davis would be pleased by her continuing involvement.

The email record then shows that Mr. Davis asked [       ] to call him in response to her forwarding of the emails. *Id.* The record does not record whether that conversation took place, or, if it did, the substance of it.

IV. The Procurement Record

Substantial portions of the tortured procurement record were produced in an ongoing series of declarations prepared solely in response to GAO

10

protests. Virtually none of the information contained in those statements appears in documents contemporaneous with the contracting process itself.

On June 1, 2015, Mr. Davis' first signed statement appears in the record in response to Starry's allegations in its second protest that he had exerted undue influence over the procurement. This is followed by an explanation from the CO dated June 3, 2015, a signed statement from Ms. Kisamore dated June 1, 2015, and a statement from [           ] dated May 15, 2015, attached to which were emails between himself and Mr. Davis. [        ], [         ], and [        ] also submitted statements to GAO dated June 2, 2015, May 29, 2015, and May 22, 2015, respectively.

The third protest at GAO prompted a new round of signed statements from agency personnel: the two previously mentioned explanations of the proposed cancellation by Mssrs. Davis and Joy and a second statement from [            ], this one dated October 8, 2015, in which he states that he had no discussions with Starry or Intellizant regarding the procurement. Bradley Lindgren, the Assistant to the Director of Accounting Services for PSC also submitted a declaration that he had met with Mr. Joy on behalf of Mr. Davis, his supervisor, regarding the UFMS contact and revising the Statement of Work. That statement is dated October 9, 2015. It is also our understanding that the agency's internal communications, such as the above referenced emails regarding the procurement, were not included in the record until the second or third protest.

## DISCUSSION

Plaintiff filed suit here on January 11, 2016. The Administrative Record was filed on February 5, 2016. Plaintiff moved to supplement the AR on February 25, 2016, asking for leave to depose Ms. Ellis, Mr. Davis, Mr. Joy, and [          ]. Plaintiff has identified three gaps in the record that it believes, in light of the history of the procurement and the bias it believes it has suffered, need to be filled in order for effective judicial review. Plaintiff also argues that these holes can only effectively be filled by the depositions of those individuals.

The first alleged gap is from November 2014 to January 2015, during which time the agency was organizing the TEP, the TEP performed its first evaluation and the CO made her award decision. Starry relies in part on the agency's own decision to take corrective action after its first GAO protest

11

because of what the agency characterized as gaps in the record, gaps which Starry argues were never filled, such as why [          ]'s questions regarding [       ]'s appearance of bias went unheeded and why [       ]'s noted a list of omissions in Intellizant's proposal but rated them as technically acceptable nonetheless. Plaintiff also seeks an explanation for why the agency decided to take corrective action after Starry's first protest was filed.

The second gap is from January 2015 to April 30, 2015. Plaintiff alleges that the record is silent with respect to the process which lead to the second award to Intellizant or why it took so long to reevaluate the same proposals. The record of this reevaluation does not contain individual evaluation sheets for each TEP member as it did for the first evaluation in 2014. Plaintiff also points out issues raised in the agency's internal email communications, which it believes are unresolved during the record for this period, such as concerns raised by [        ] and [        ] regarding Intellizant's proposal, and, at least in [       ]' case, why those concerns did not show up in the final consensus TEP report. [        ] also asked for further clarification regarding the issues that [        ]'s had initially raised regarding omissions from Intellizant's proposal. AR 1485-86 ([        ] emails). Plaintiff finds the response from the CO, AR 1487, to be insufficient.

The third alleged gap is from July 2015 to September 2015. Specifically, plaintiff alleges that the record does not explain why the agency only began to consider cancellation of the solicitation after the second GAO protest was sustained. Plaintiff also points out that there is no explanation for what took place in meetings during this period that are otherwise referred to in documents. *See* AR 1543-45 (agency emails). Plaintiff believes that the steps taken by agency personnel during this period, especially after the August 11, 2015 GAO decision, are not explained in contemporaneous documents. The decision to cancel simply appears *ex nihilo*.

Defendant objects to plaintiff's discovery request. It does, however, attach two documents to its opposition that it believes should have been included in the AR. The first is an email from agency counsel to the parties and GAO on September 8, 2015, which explains the agency's rationale for cancelling the solicitation rather than reevaluating Intellizant, as recommended by the GAO. The second document is a declaration of the CO, created March 9, 2016, in which agency counsel attempts to recapitulate the various decisions

of the agency throughout the two and a half year history of this procurement.

Defendant argues that Starry has not made the requisite showing of a credible allegation of bias. Defendant also argues that, even if there are gaps in the record, the record is still sufficient for the court to do a review, particularly in light of the March 2016 declaration of Ms. Ellis that defendant proposes we add to the record. Alternatively, it suggests that any gaps that might exist would be better addressed by remand to the agency.

Plaintiff replies that much of the information the agency relies on to respond to the assertions of a lack of an adequate record consists of after-the-fact declarations offered to the GAO or to this court; the information is not contemporaneous with the real events as issue. Insofar as gaps remain, plaintiff responds that a remand, in the face of serious documented assertions of the appearance of bias would be inappropriate because such allegations uniquely raise concerns that the agency will be less than candid in documenting what occurred.

I.  Plaintiff Has Presented Credible Allegations of Bias

Bid protests in this court are conducted under the standards set forth in the Administrative Procedures Act. 28 U.S.C. § 1491(b)(1)(4) (2012). As such, the parties and the court are normally limited to reviewing the agency's record of the procurement, which is meant to be contemporaneous with the events as they happened and to supply the parties and the court with an explanation of the agency's decision making process. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009). Supplementation of the administrative record is warranted only when it is necessary to ensure effective judicial review. *Id.* Discovery by deposition, therefore, would be unusual.

Nevertheless, we are satisfied that plaintiff has made the appropriate case for supplementation through discovery. Effective judicial review is not possible when the administrative record "is missing 'relevant information that by its very nature would not be found in an agency record–such as evidence of bad faith, information relied upon but omitted from the paper record, or the content of conversations.'" *InfoReliance Corp. v. United States*, 118 Fed. Cl. 744, 747 (2014) (quoting *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343-44 (2004)). As this court has recognized on several occasions, "rare indeed would be the occasions when evidence of bad faith will be placed in an

administrative record." *Beta Analytics Int'l v. United States*, 61 Fed. Cl. 223, 226 (2004); *see also, e.g.*, *L-3 Commc'ns Intergrated Sys., L.P. v. United States*, 91 Fed. Cl. 347, (2010); *Int'l Res. Recovery, Inc. v. United States*, 61 Fed Cl. 38, 41-42 (2004). Courts have therefore "traditionally considered extra-record evidence in assessing alleged bias or bad faith." *Int'l Res. Recovery*, 38 Fed. Cl. at 41-42.

While government officials are presumed to operate in good faith, *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002), a protestor is entitled to investigate bias if it can make a threshold showing of "motivation for the Government employees in question to have acted in bad faith or conduct that is hard to explain absent bad faith," and that "discovery could lead to evidence which would provide the level of proof required to overcome the presumption of regularity." *Beta Analytics*, 61 Fed. Cl. at 226.

A. Questionable Conduct

While plaintiff casts its motion as a request to fill gaps in the record, and while the record here is remarkably innocent of details supporting the numerous steps in the procurement process (especially the agency's change in needs and decision to cancel the procurement), we treat the real thrust of plaintiff's request as one for permission to investigate its assertions that Mr. Davis was biased and that the bias affected the outcome.

There is credible evidence in the record that Mr. Davis was biased and that, despite his self-proclaimed recusal, he continued to affect the outcome of the procurement in a way that benefitted his former employer. The most obvious example, of course, is his decision to cancel the procurement after Intellizant's two failures to obtain the award. Mr. Davis was a relatively recent former employee of Intellizant, and he recognized his own apparent bias and purported to recuse himself from the procurement process. AR 940.

[          ] states that Mr. Davis expressed both the inevitability and desirability of award to Intellizant. He also states that Mr. Davis directed [      ] not to participate in the TEP due to [      ]'s ongoing involvement with Starry on the UFMS contract but then encouraged the participation of [      ] who was similarly situated to [        ] with regard to Intellizant on a different contract. [          ] also states that he was asked by Mr. Davis to rate Starry's performance as "unprofessional" for the current UFMS

14

contract and that, when he declined to do so, his relationship with Mr. Davis became strained.

We also have email correspondence between various agency personnel during the events described above. Those emails reveal that, despite Mr. Davis' representation that he had recused himself from the procurement in toto, he had a hand in selecting the TEP. They reflect that [      ] went to Mr. Davis when confronted with a challenge to her independence in the matter. Even after that question was resolved, she followed up with Mr. Davis by forwarding him the CO's resolution of the issue. He almost immediately asked her to call him after receiving her message. This suggests something more than disinterested observation on the part of Mr. Davis.

Finally, despite his protestations that he was generally uninvolved, Mr. Davis was clearly the decision maker with regard to the cancellation of the solicitation and failure to follow GAO's direction to reevaluate the award to Intellizant. While Mr. Davis as a director of one of the components of the PCS had a legitimate interest as a "customer" in obtaining only needed services, there is evidence calling into question whether the decision to cancel the solicitation was based solely on the absence of need.

On August 11, 2015, GAO sustained Starry's second protest, laying out a variety of deficiencies in the agency's evaluation of Intellizant, and recommending that the agency reevaluate the award consistent with its directions. The recommendation was, on its face, prejudicial to Intellizant and potentially beneficial to Starry. The agency never followed that recommendation, however, because, Mr. Davis changed his mind regarding its needs from the UFMS support contract. Mr. Davis' second statement for the record suggests that the idea to revise the agency's need arose prior to GAO's August 11 decision.

Mr. Joy's statement for the record, although lending some credence to the notion that Mr. Davis considered factors other than Starry's success at GAO, also informs the court that Mr. Joy and others at the agency were awaiting the outcome at GAO before action on cancellation of the solicitation. At oral argument, government counsel suggested that, had the agency prevailed at GAO, it could have continued with the award to Intellizant and then modified the contract later to drop the work that the agency discovered was duplicated by the license agreements. There is no record support for that explanation, and it would, in any event, be highly anticompetitive for the

15

agency to compete a contract on the basis of needed expertise with several software systems, while knowing before final award that it did not need that expertise, and yet awarding on that basis anyway. As Mr. Joy stated up front in his statement for the record, dropping that requirement would presumably open the competition to more bidders.

We are thus left with a situation in which a previously-recused agency official stepped in to cancel a solicitation after the agency was unsuccessful in multiple efforts to award the contract to his former employer. Plaintiff proffers evidence that the rationale for waiting for the outcome of the third protest was pretextual. All of this after the same allegedly self-recused official was consulted regarding the make up of the TEP, was kept informed of the process by the TEP panelists that he recommended, advised one potential TEP member that he had a bias issue while ignoring the same issue presented by his own recommendee, made known his preference for one offeror, and allegedly attempted to bias a performance rating for the protestor.

In sum, plaintiff has presented a credible allegation of "motivation for the Government employees in question to have acted in bad faith or conduct that is hard to explain absent bad faith." *Beta Analytics*, 61 Fed. Cl. at 226. We thus turn to the question of whether the supplementation sought is likely to lead to evidence sufficient to overcome the presumption of regularity.

B. Evidence Likely to be Developed by Depositions

A protestor must present clear and convincing evidence that an agency official acted with bias or in bad faith in order to overcome the presumption of regularity. *See generally Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004). Supplementation of the record, however, requires a lesser standard–a showing of likelihood that discovery would lead to evidence that would meet the clear and convincing standard. *L-3 Commc'ns*, 91 Fed. Cl. at 355. We find that the standard is met here.

As detailed above, Mr. Davis continued to have a hand in the procurement, guiding the composition of the TEP, readying other agency personnel for an eventual switch to a new contractor, and eventually cancelling the solicitation after it became apparent that the agency would have difficulty awarding to Intellizant. Some of his explanation for his involvement is contradicted, or at least cast in a different light, by other record evidence such as the statements of Mr. Joy and [          ] and the email correspondence

16

revealed at GAO. Further, even assuming it was not improper for Mr. Davis to have reinserted himself in the process to cancel the solicitation, his decision-making process is not documented in the record in any contemporary fashion. Instead it appears only through two self-serving *post-hoc* explanations prepared for litigation at GAO.

In the face of credible allegations of bias and unexplained agency action, we are left to conclude that the depositions of Mr. Davis, Ms. Ellis, Mr. Joy, and [     ] are necessary for the court to resolve the issues presented. We find that plaintiff meets the burden for showing that its request is likely to lead to evidence that would overcome the presumption of regularity. The statements of [     ] already contained in the record directly suggest bias on the part of Mr. Davis. The statement of Mr. Joy at least partially contradicts the implication of Mr. Davis' second statement for the record that his decision to cancel the solicitation was unrelated to GAO's decision in favor of Starry. [     ]'s involvement in the TEP is questionable in light of [     ]'s representation that he was asked to abstain for participating in the TEP because of his involvement with an offeror's effort on a contract with HHS but [     ] was not asked to abstain for that same reason. Ms. Ellis, the CO and the official ultimately responsible for the procurement, cleared [     ]'s involvement. Thus, the taking of depositions of these individuals will produce testimony that is more probative than the largely self-seeking *post-hoc* explanations currently contained in the record. Examination by counsel may result in fuller explanations of the agency's actions and decisions, as far as they exist, for the agency's actions and decisions.

II. Depositions Are Warranted

Defendant also argues that, if the court were to find the record lacking in some respect, that the only warranted remedy is to remand to the agency to supply yet another round of after-the-fact explanations. We decline that invitations for two reasons.

First, we gave defendant an opportunity to supplement the record at the onset of this case in light of the allegations contained in the complaint. *See* Order of February 12, 2016. Defendant declined that invitation. *See* Defendant's Status report of February 19, 2016. Defendant elected to proceed with the explanations that agency officials had already presented to the GAO. We do not see a reason to give it another chance to answer that question differently now.

17

Second, in light of the credible allegations of bias and spotty explanations of agency conduct, the inclusion of new explanations short of discovery by means of depositions is unlikely to result in information useful to the court in resolving the merits of this protest. Depositions are warranted.

CONCLUSION

We conclude that plaintiff has met its burden in showing why it is necessary to supplement the administrative record with the four depositions detailed above. Although the protest is framed as a challenge only to the cancellation of the solicitation, given the well-founded allegations of bias, the long history of this procurement, and Mr. Davis' involvement at different points along the way, we will open the record to examination of all of the agency's actions from inception to cancellation of the solicitation through the four depositions requested by plaintiff. Accordingly, the following is ordered:

1. Plaintiff's motion to supplement the administrative record is granted.

2. Defendant's request to include in the AR the two documents attached to its opposition is granted. The email from HHS counsel and the declaration of Ms. Ellis will be considered part of the Administrative Record.[6]

3. Plaintiff is granted leave to take the depositions of Mr. John Davis, Mr. Patrick Joy, Ms. Cassandra Ellis, and [           ].

4. The parties are directed to endeavor to complete those depositions within the next three weeks.

5. The parties are directed to file a joint status report on or before April 8, 2016.

s/ Eric G. Bruggink<br>
ERIC G. BRUGGINK<br>
Judge

---

[6] We recognize that Ms. Ellis' declaration is not a contemporaneous record of agency decision making, but, in light of our grant of plaintiff's motion to supplement the record, we will allow it added to the record.