# In the United States Court of Federal Claims

No. 16-44C
(Originally filed: July 15, 2016)
(Re-filed: July 27, 2016)[1]

* * * * * * * * * * * * * * * * * * * * * * *

STARRY ASSOCIATES, INC.

*Plaintiff*,

v.

THE UNITED STATES,

*Defendant*.

* * * * * * * * * * * * * * * * * * * * * *

Bid Protest; Assertions of Bias; Irrationality; Failure to Document.

*Lars E. Anderson*, Reston, VA, with whom was *James Y. Boland*, Tysons Corner, VA, for plaintiff.

*Alexis J. Echols*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Douglas K. Mickle*, Assistant Director. *Christian Maimone*, Office of General Counsel, U.S. Department of Health and Humans Services, of counsel.

*Jennifer A. Semko*, Washington, DC, with whom was *Brian L. Whisler*, for intervenor.

OPINION AND ORDER

BRUGGINK, Judge

This is a post-award protest by Starry Associates, Inc. ("Starry") of the Department of Health and Human Services' decision to cancel a solicitation

---

[1] This opinion was originally issued under seal to afford the parties an opportunity to propose redactions of protected information. The parties have agreed that no redactions are necessary.

after the agency lost Starry's second bid protest at the Government Accountability Office ("GAO"). Plaintiff alleges bias and irrationality on the part of the agency in making the decision to terminate the procurement. Cross-motions for judgment on the administrative record are fully briefed, and oral argument was held on July 6, 2016. Because there is no evidence that the agency undertook any meaningful review of its needs before cancelling the solicitation, we conclude that its decision was arbitrary and capricious. Although we view independently the bona fides of the cancellation decision, we note that it punctuates a series of actions which reflect a lack of fidelity to the procurement process.

In an earlier opinion, we granted plaintiff's motion to supplement the administrative record with discovery. While recognizing that such supplementation is very much the exception, we concluded that there were sufficient credible assertions of potential bias that we permitted plaintiff to take depositions as the only practical means of obtaining the information necessary to prosecute its protest. Plaintiff took the depositions of John Davis, Cassandra Ellis, Karen Slater and John Thompson. Both parties cited to the transcripts of those depositions in making their subsequent arguments.

## BACKGROUND

The Department of Health and Human Services ("HHS") Program Support Center ("PSC") issued Request for Quotations No. 15-233-SOL-00023 ("RFQ" or "solicitation") on November 13, 2014. The procurement was set aside for small businesses and called for award to the lowest priced, technically acceptable offeror. PSC sought to procure a range of business operations services to support HHS's financial management system known as the "Unified Financial Management System" ("UFMS"). Starry is the incumbent provider of on-site operational support for UFMS.

UFMS is built on a backbone of commercial software known as Oracle Federal Financials, part of the Oracle E-Business Suite, an off-the-shelf commercially available software package. The RFQ thus required key personnel to have experience with that software as well as with UFMS. The agency was also looking for expertise regarding several other systems that worked in coordination with UFMS. Two are relevant here, the Managing Accounting and Credit Card System ("MACCS"), a system for accounting purchases made by government credit card holders, and GovNet-NG ("GovNet"), a reporting system used to distribute operational reports. *See*

Administrative Record ("AR") 54-55. Both MACCS and GovNet-NG are proprietary systems developed by Starry and are licensed to HHS separately. AR 48.

Three companies timely submitted quotations. The lowest priced bidder was Intellizant, LLC ("Intellizant"). As the low-priced bidder, it was evaluated for technical acceptability along with past performance and Section 508 Compliance.[2] The acquisition plan called for the initial technical evaluation to be performed by a Technical Evaluation Panel ("TEP") and then a final award decision to be made by the Source Selection Authority ("SSA"). The TEP was comprised of three individuals: John Thompson, Karen Slater, and Arlette Peoples. Mr. Thompson and Ms. Slater are referred to in the administrative record as "certified by the COR [Contracting Officer's Representative]."[3] AR 593. The TEP received the three proposals by email on November 26, 2014.

Plaintiffs allege that this procurement was tainted from its inception by the undue influence of John Davis, who serves as Accounting Services Division Manager at PSC. Mr. Davis represented to GAO in a signed declaration that he had recused himself from this procurement. AR 940 ("I recused myself from this procurement because I am a former employee of Intellizant."). Plaintiff makes much, however, of that the fact that the record reveals that Mr. Davis was involved in the composition of the TEP. Hence we examine facts relevant to that allegation here.

Mr. Davis was employed by Intellizant immediately prior to joining PSC, during which time he was involved in Intellizant's unsuccessful effort to secure the incumbent contract for UFMS support. Mr. Davis joined HHS PSC in August 2010. Before working for Intellizant, Mr. Davis was employed at another government contractor along with Intellizant's current CEO.

---

[2] "Section 508" refers to section 508 of the Rehabilitation Act of 1973, which requires that federal agencies provide software and website accessability to disabled persons.

[3] The administrative record is not clear as to what the importance is of being certified by the COR other than that the CO saw fit to mention it in the award decision.

Mr. Davis is the supervisor of Chet Levesque, who was the COR for the incumbent UFMS contract.[4] Mr. Levesque prepared the Performance Work Statement ("PWS") for the current solicitation. In a signed statement prepared for the GAO, he represented that Mr. Davis "highly recommended" that he (Levesque) recuse himself from the TEP due to his involvement with the incumbent UFMS contract. AR 957. After Starry's first protest, Mr. Levesque offered to once again be part of the TEP, but Mr. Davis told him that it "would not look good." *Id.* Instead, the TEP was, according to Mr. Levesque, made up of individuals selected by Mr. Davis. *Id.* Plaintiff alleges that Mr. Davis asked him to recuse himself because of Mr. Levesque's consistent positive performance feedback for Starry during the incumbent contract performance, of which Mr. Davis was aware. Mr. Levesque also states that Mr. Davis asked him to give Starry negative feedback at one point. AR 958. His refusal to comply with that request has caused friction in their relationship, according to Mr. Levesque. *Id.* Finally, Mr. Levesque stated that he was instructed by Mr. Davis several times to prepare for a change in vendor and that Mr. Davis represented that Intellizant would be much better "than what we have today" in terms of UFMS support. *Id.*

Internal correspondence between Mr. Levesque and Mr. Davis reveals that Mr. Levesque inquired of Mr. Davis who and how many persons should make up the TEP. Mr. Davis recommended a panel of three and recommended three names, one of whom, Ms. Slater, was eventually part of the TEP. AR 1535-36. Mr. Levesque responded that there should be at least "one person with UFMS experience," and further recommended that Mr. Davis, Ms. Peoples, and Mr. Thompson comprise the TEP. AR 1534-35. He also offered his own services if Mr. Davis felt that appropriate. Mr. Davis replied that he (Davis) should be replaced by Ms. Slater or Ed Jackson, both of whom he assured were "well aware of what's being awarded and what the awardee will be doing." AR 1534. The record is not clear how the final composition of the TEP was reached, but Mr. Levesque avers that he acted at the direction of Mr. Davis because he did not want to be "found insubordinate." AR 957. The TEP was empaneled on November 25, 2014. Mr. Levesque further represents in his declaration to GAO that, after empaneling the TEP, he had no further

---

[4] "COR" stands for Contracting Officer's Representative. The COR for a particular contract is the government representative that handles the day-to-day administration of a particular contract.

involvement in the UFMS procurement because he was directed to recuse himself by Mr. Davis.

Ms. Slater was the COR for Intellizant's other unrelated contract with HHS known as the "PRICES" contract. On November 21, 2014, she prepared a past performance questionnaire for Intellizant on that contract and submitted it to Megan Kisamore, the Contract Specialist for the UFMS solicitation. She rated Intellizant as "exceptional" in every category and stated that she "definitely would" award another contract to Intellizant. AR 313. In a signed statement submitted as part of the agency's report to GAO, she stated that she was unaware of any involvement by Mr. Davis with the subject procurement and has very little day-to-day contact with him. AR 965. She repeated these representations during her deposition as part of this case. The record reflects, however, that Ms. Slater sought the input of Mr. Davis when her involvement in the TEP was questioned by Mr. Thompson. Email correspondence reflects that Mr. Davis assured her that it was proper for her to participate and thanked her for her willingness to do so. *Id.*

On November 26, 2014, Mr. Thompson questioned Ms. Slater's inclusion in the TEP when it was revealed that Intellizant was the lowest priced offeror, given that Ms. Slater had submitted a favorable past performance questionnaire for Intellizant only days before. AR 1449. He did not question her integrity in fact but only whether she would appear to be biased. Ms. Slater responded that she was asked to serve on the TEP by Mr. Levesque "per the direction of John Davis." AR 1448. She suggested that she be replaced by Mr. Jackson and further directed Mr. Thompson to inquire of Mr. Davis regarding her involvement in the matter. *Id.* Instead, Mr. Thompson relayed his concerns to Ms. Kisamore, who in turn relayed them to Ms. Ellis, the CO. Nine minutes later, Ms. Kisamore replied back to Mr. Thompson that the CO had cleared Ms. Slater's involvement. AR 1472-73 ("there is no issue"). Ms. Slater then forwarded the entire chain of emails regarding her involvement to Mr. Davis with the following encapsulation: "FYI – no more concerns," which was followed with a smiley face emoticon. AR 1523. He responded by asking her to call him on his cell phone. Ms. Slater testified at her deposition that she did call him but was unable to recall what was said. Mr. Davis testified that he simply reiterated to her the propriety of her involvement.

The TEP sent its completed evaluation, comprised of the individual reports of its three members and a consensus evaluation sheet, to the SSA on

December 3, 2014. The evaluations were not unanimous. Ms. Slater and Ms. Peoples found Intellizant's proposal to be acceptable for all three factors, although Ms. Peoples did find certain information missing from Intellizant's proposal. She noted that the requirement to "provide adequate knowledge transfer to enable the PSC UFMS users to perform the process themselves" was missing. AR 553. Implicitly, this would require knowledge of Starry's proprietary software: GovNet and MACCS. The consensus evaluation sheet discloses a number of questions that Ms. Peoples had concerning where in Intellizant's proposal various items from the PWS were addressed. *See* AR 589-90. These ultimately did not warrant an unacceptable rating in her final view, however, because she believed the omissions could be "addressed at some point" and that they were "outweigh[ed] [by] the strengths of the technical aspects of Intellizant's proposal." AR 586. That conclusion was born of a question she posed to Ms. Kisamore shortly before completing her evaluation.

On December 3, 2014, Ms. Peoples emailed Ms. Kisamore and asked whether she ought to rate Intellizant as unacceptable because she found some RFQ requirements unaddressed in the proposal. AR 1505. Ms. Kisamore answered her, erroneously, that the agency would be able to hold "discussions" with a lowest price, technically acceptable offeror after award to "clear up any questions/clarifications." *Id.* She also suggested to Ms. Peoples that in order to "find a vendor's quote to be unacceptable," she needed to have "strong reasoning." *Id.* When asked during deposition about Ms. Kisamore's representations to Ms. Peoples regarding post-award discussions, Ms. Ellis admitted that they were incorrect and had been made without consultation with Ms. Ellis. AR 2051-52.

Mr. Thompson rated Intellizant technically unacceptable overall, noting that several areas of Intellizant's proposal were unacceptable. AR 559. Similarly to Ms. Peoples, Mr. Thompson noted that the "functional knowledge transfer and training" requirement of the RFQ would be an issue because Intellizant's experience is "limited and does not sufficiently address the task of maintaining PSC and UFMS in its entirety." AR 566. Mr. Thompson further noted that the RFQ's Statement of Work Resource requirements would be an issue since Intellizant cited "no prior experience with the MACCS interface"–one of Starry's proprietary software programs. AR 567.

Ms. Slater did not share these concerns. She found no problems with Intellizant's proposal. Her evaluation sheet–the shortest of the three–records

that she "thoroughly reviewed the quote provided by Intellizant" and found that it "demonstrated a comprehensive approach for successful transition" and that the "number of resources required to perform each task is reasonable." AR 569. She touted Intellizant's experience with "Oracle Release 12," something she states is "critical for PSC." *Id.* She further noted that PSC needed the UFMS work to be "performed by skilled and experienced personnel." AR 570. She then states that "Intellizant staff includes professionals with certified [personal] knowledge of Oracle financials, project management, training, communications, and reporting experience." *Id.* Whether this judgment was based on the solicitation or her personal experience with Intellizant is unclear. Ms. Slater's deposition testimony provides further insight in this regard. When asked what she relied on in performing her evaluation, she answered, "[p]revious experience with the contractor." AR 1817. When asked for further clarification regarding how she determined that the proposal was acceptable, she replied "By reading [Intellizant's] responses to the [solicitiation] . . . . And just prior knowledge of their capabilities." *Id.*

The SSA, Cassandra Ellis, who was also the Contracting Officer ("CO") for this procurement, after reading the TEP's assessment, evaluated Intellizant's proposal herself and determined that Intellizant was technically acceptable. *See* AR 594 (Award Decision Document). She listed some of the concerns from the TEP: "minimal detail or omission of detail regarding performance metrics, minor computation errors and [lack of] specific detail regarding the accomplishment of the knowledge transfer." *Id.* She found, however, that those concerns could be "easily . . . addressed at the time of award, and do not outweigh the strengths of the technical aspects of Intellizant's quote. The computational errors were corrected in the second revision of Intellizant's quote." *Id.* She also found that Intellizant had experience with the "existing software" and with "Oracle R12 which will be implemented in the coming fiscal year." *Id.* She thus awarded the contract to Intellizant on December 18, 2014.

When asked at deposition about the statement in the award decision that omissions could be corrected after award, Ms. Ellis maintained that her view of Intellizant as having an overall acceptable offer drove her decision to find them acceptable despite any missing information. *See* AR 2053-55. When pressed on the issue of the legality of correcting proposal omissions after award in a lowest price, technically acceptable procurement, she shaded her statements in the award decision document by explaining that she did not find any "complete omissions" and that she was not "looking for specific details in

LPTA procurement. I was just looking for technical acceptability." AR 2056. She also stated that she had made, at the time, a finding that all elements of the PWS had been met by Intellizant's proposal. AR 2057.

Starry was notified of the award the same day. It had a higher evaluated price but was not evaluated for other factors because Intellizant was found to be technically acceptable. Plaintiff filed a protest at the Government Accountability Office ("GAO") on December 29, 2014. Starry alleged that the agency's evaluation of Intellizant was unreasonable because of Intellizant's asserted inability to meet all the statement of work elements and lack of qualified key personnel.

On January 6, 2015, HHS informed GAO and Starry of its intent to take corrective action. After inquiry from GAO, HHS explained that it did "not intend to reevaluate the requirement or solicit new proposals." AR 715. Instead, the agency represented that the protest had "revealed certain gaps in the record" that needed to be filled, and thus it intended to "thoroughly review the contract file and ensure that the evaluation is complete, accurate, and fully consistent with the requirements of the RFP." *Id.* This was not to be a reevaluation but rather a strengthening of the award decision documentation, specifically with regard to the issues raised by Ms. Peoples and Mr. Thompson. *See* AR 2068-71. Ms. Ellis revealed at deposition that, despite advice from counsel that omissions could not be fixed after award, she was unconcerned by the issues raised by the protest. AR 2064. GAO dismissed the protest as academic on January 7, 2015.

In response to what it believed to be an insufficient scope of corrective action, Starry sent a letter to the Clerk of Court of this court, stating its intent to file a bid protest. On January 9, 2015, after further consultation with counsel, Ms. Ellis sent a letter to Starry indicating that the agency now intended to reevaluate proposals and make a new award decision. AR 718. That representation prompted Starry to withdraw its notice of intent to protest here.

This second evaluation lasted much longer than the first, from January 16, 2015, to April 29, 2015, although the record as supplemented reflects very little additional effort at evaluation. The TEP was once again unable to come to a unanimous conclusion because Mr. Thompson again rated Intellizant as unacceptable for the technical factor. There is virtually no contemporary documentation of that process, and the record does not contain individual

reports of the TEP members despite the fact that individual evaluations were allegedly performed. *See* AR 751 ("the TEP members each conducted an individual evaluation"). The TEP met together several times during the period of February 11 through April 10, 2015 to prepare the consensus report. *Id.* The final report was dated April 28, 2015. Ms. Slater recalled at deposition that the TEP members finished the document on April 10. Afterwards, Ms. Ellis and agency counsel, Mr. Hildebrand, made edits to the document before it was issued in final form on April 28. The report first lists a majority finding, and then a minority finding when they disagreed, for each element of the PWS. The report sent by the TEP on April 10 but not yet edited by the CO and counsel was not produced as part of the record.

The depositions provide an illuminating, if depressing, window into how the agency followed up on its representations to plaintiff, and, indirectly, to GAO. In Ms. Slater's deposition, for example, she made it quite clear that she had insufficient knowledge of the UFMS software, contrary to Mr. Davis's representation that she was "well aware" of what was being awarded. *See* AR 1782. Despite her lack of knowledge, Ms. Slater rated Intellizant as technically acceptable based on her previous experience with the company in the PRICES contract. AR 1830. Ms. Slater testified that she used her evaluation sheet from the agency's first aborted award as a base for her evaluation the second time: "I had the original. I may have modified it a little bit. We all met as a team, and then we inserted our extra support." AR 1854. When pressed on the issue, she was unsure whether she actually completed a new individual evaluation sheet during the second evaluation or whether the TEP members only drafted one joint document during their three month redo period. She also disclosed that she was "kind of quiet" during the TEP's second evaluation because the other two members "ha[d] more knowledge of UFMS." AR 1857. She never considered changing her recommendation, however, despite her lack of experience and Mr. Thompson's noted concerns, because "she dealt with [Intellizant] on a daily basis" and "felt confident that they could do this work." AR 1875. She also stated that, overall, she spent less time on the second evaluation than she did on the first. AR 1853. This is surprising given that she testified to having spent "a good day's work" performing her evaluation of Intellizant the first time. AR 1817.

Ms. Ellis's deposition was equally illuminating, giving insight into the flaws of the first evaluation, flaws which continued into the second award decision. After receiving the initial consensus report of the TEP, Ms. Ellis never followed up with Ms. Peoples as to why, despite deficiencies in

Intellizant's proposal, she still rated them technically acceptable. AR 2038. She likewise never questioned the appropriateness of rating Intellizant technically acceptable despite its failure to address all of the PWS requirements. *Id.* When asked why she came to the conclusion that Intellizant was acceptable despite two evaluators having found missing information regarding PWS elements, she answered that she felt comfortable making the award because two of the three found Intellizant to be acceptable and because she was able to find areas addressing Ms. People's concerns in the proposal. AR 2133-2134. What it was in Intellizant's proposal that relieved her concerns is still a mystery.

Ms. Ellis' behavior in the second evaluation was also concerning. Ms. Ellis instructed Mr. Thompson not to pursue his concerns about Intellizant's staffing deficiencies during the reevaluation because they were outside of the scope of the solicitation. AR 2086. She maintained that resumes only had to be furnished in advance for "key personnel," but admitted in her deposition that no persons were so designated in the solicitation. When asked about this discrepancy she was "unconcerned." These same problems were eventually found to be highly relevant by GAO during Starry's second protest. Ms. Ellis also instructed the TEP during the second evaluation that the evaluators could not find Intellizant to be acceptable if they identified elements of the PWS unmet by its proposal. AR 2082.

Ms. Slater testified that she and the other TEP members were instructed by Ms. Ellis to provide more support for their evaluation because there was a protest. AR 1849. It was her understanding that the purpose of the reevaluation was to "provide more support to our original evaluations." AR 1851. She further reports that Ms. Ellis did not discuss or raise any issues from the individual evaluations with the TEP members. This is important because it is clear from her testimony that Ms. Ellis relied on the fact that two of the TEP members rated Intellizant as acceptable. This fact gave her confidence in finding the same regardless of the omissions identified by Ms. Peoples and Mr. Thompson in the first instance and Mr. Thompson in the second.

The SSA's report and second award determination stated the minority and majority evaluators' views as to the three main facets of the technical proposals: 1) Functional Knowledge Transfer and Training; 2) Monthly, Quarterly, and Year-End Processing Support; and 3) Minimum Resource Requirements. For each area, the CO agreed with the majority's evaluation

and found Intellizant to be technically acceptable. This time, no concerns were listed for Ms. Peoples either in the consensus report or the final award decision.[5] Ms. Ellis thus concluded that award should be made to Intellizant as the lowest priced, technically acceptable offeror. Offerors were notified of that result the same date as the decision memo, April 30, 2015.

On May 5, 2015, Starry filed a second protest at GAO, once again challenging the award on the basis of Intellizant's alleged lack of experience in all areas of the performance work statement and lack of qualified key personnel. Starry also alleged that Mr. Davis was biased in favor of Intellizant and had attempted to exert influence to guide the award to Intellizant.

GAO held a hearing on July 15, 2015, and took testimony from Ms. Ellis. On August 11, 2015, GAO sustained the protest in part and denied it in part, finding that the Ms. Ellis had failed to "evaluate whether the personnel proposed by Intellizant were capable of performing the PWS tasks" and "failed to evaluate whether Intellizant could provide the personnel necessary to meet the solicitation's requirements." AR 1129 (first GAO decision); *Starry Assocs., Inc.*, B-410968.2 , 2015 CPD ¶ 253 (Comp. Gen. Aug. 11, 2015). GAO found the allegations of bias to be "without merit" based on Mr. Davis' representation to GAO that he had "recused" himself from the procurement process. AR 1130. GAO concluded by recommending reevaluation of the proposal in accordance with the RFQ's stated PWS and key personnel criteria, adequate documentation of that evaluation, and, if the agency found Intellizant to be lacking, to terminate the award and evaluate the next-in-line offeror. AR 1130-31.

Plaintiff took the deposition of Patrick Joy who was at the time and remains today the interim head of contracting activity at PSC. He testified during his deposition that he was notified by HHS counsel after the hearing at GAO that the agency was likely to lose the protest. His declaration submitted to GAO during the third protest records that he also had a conversation with Mr. Davis at some point prior to the rendering of GAO's decision in the second protest. He reported that Mr. Davis raised the possibility of revising the RFQ to drop from the solicitation the awardee's need to support GovNet and MACCS. These were areas in which Intellizant had been marked as deficient by Mr. Thompson. Mr. Joy instructed him not to take any action with

---

[5] The record contains no indication how or on what basis Ms. People's concerns were resolved.

regard to the solicitation prior to a GAO decision, however, because the agency's "course of action would be dependent on the decision of GAO." AR 1246. He confirmed this exchange during his deposition. AR 2312.

After GAO issued its decision, agency counsel, Mr. Hildebrandt, sent an email to contracting personnel, including Mr. Joy and Ms. Ellis. He stated that GAO's recommendation was not mandatory and that alternatives included "canceling the solicitation and competing under a new vehicle [or] amending the RFP and soliciting new [offers] under the current vehicle." AR 1545. On August 14, 2015, Mr. Joy forwarded that email to several of his colleagues in contracting (Earl Pinton and Scott Brna) and to John Davis, requesting a meeting to discuss the agency's options. *See* AR 1544-45. He recalled at deposition that several such meetings were held but could not specifically remember Mr. Davis' attendance. AR 2310. He did recall that Mr. Davis told him "at some point, that he thought that the statement of work was wrong on those two systems." *Id.* (referring to MACCS and GovNet). Mr. Davis testified that he did not recall receiving that email nor being present at any meetings to discuss the agency's options after the GAO decision.

When asked further about the contents of such discussions, Mr. Joy testified that he "did not contemplate reevaluating Intellizant's proposal" because he and others had been told, presumably by Davis, that "there were problems with the RFQ," which would take precedence over reevaluation. AR 2317-18. Mr. Joy recalled meeting with one of Mr. Davis' subordinates, Brad Lindgren. This is confirmed by an email contained in the record from Lindgren to Mr. Davis. In it, Mr. Lindgren states, based on a conversation with Mr. Joy, that, if Mr. Davis wanted to cancel the RFQ, he would have to provide Mr. Joy with "a detailed rationale for the action to cancel the award. We need to explain how we no longer have a need for the services as described in the [current PWS]." AR 1547. He further stated that, if the agency wanted to keep the 2015 funds obligated for the UFMS contract, then a new TEP would have to perform a new evaluation. "If we choose this route, then we have to complete the panel review immediately and probably have to issue a revised award." *Id.*

Mr. Davis testified at length in his deposition regarding the import of the email quoted above despite have only a limited recall of having received it. He was insistent that Mr. Lindgren had no basis to make these recommendations because he worked in finance and was not in a position to tell Mr. Davis what was necessary from a contracting standpoint. He admitted

that the decision whether to cancel the solicitation was left to him by Mr. Joy. *See* AR 2579-80.

Later that same day, September 2, 2015, Mr. Davis emailed Mr. Joy with his decision to cancel the RFQ. In the email, he stated that he had instructed his staff to "review and revise, where needed, a few of our support contracts" for UFMS. AR 1549. This review had apparently brought to his attention the insight that support for two systems used by UFMS were the subject of separate contracts "established specifically for them." *Id.* Thus these two systems need not have been included in the UFMS support contract. He states that he instructed his staff to revise the PWS and that they would be submitting "revisions with a new requisition." *Id.* He further stated that PSC had just "renewed the contracts for the other two systems a few weeks ago." *Id.* Mr. Lindgren confirmed for Mr. Joy that Mr. Davis was referencing the MACCS and GovNet systems.

Mr. Davis' October 8, 2015 declaration to GAO during Starry's third protest, purports to provide further detail in this regard. In it, Mr. Davis avers that the COR for the MACCS and GovNet license agreements asked him to sign off on their renewals. The GovNet renewal was in May 2015, and the MACCS contract was up for renewal in September 2015. This request triggered his conclusion that the UFMS support contract should not include support for these systems because those services were already covered by separate contracts. *See* AR 1243. He also stated that the UFMS system and the two proprietary Starry systems "do not talk with each other" and thus were not very integral to supporting UFMS. *Id.* That being the case, he concluded that it was unnecessary to reevaluate Intellizant and decided a better course was to cancel the solicitation and re-solicit only those services needed as part of the UFMS effort. AR 1244. The record reflects that the MACCS license agreement was renewed in May 2015 and the GovNet license was renewed on September 30, 2015. We also note that these statements to GAO are inconsistent with the explanation he earlier provided to Mr. Joy. For Mr. Joy, Mr. Davis explanation was that it was a staff review of UFMS support contracts that brought the alleged duplication to Mr. Davis' attention, but to the GAO, it was the COR for the license agreements that brought it to his attention when the licenses needed renewing.

Mr. Davis was examined at length during his deposition in this case regarding his decision to cancel the solicitation and revise the agency's needs. His answers reveal a different picture than those presented to GAO and to Mr. Joy. He was asked whether he reviewed the MACCS license before sending

his decision to Mr. Joy on September 2, 2015. His answer was that he doubted it. AR 2613. He was asked whether a detailed comparison had been done; his reply was only that he "had some knowledge of this stuff" and that he did not recall doing any side-by-side comparison between the license agreements and the UFMS support solicitation. AR 2632.

When further asked to compare the documents during his deposition, he demurred, stating that counsel should ask "one of the technical guys" at PSC to do that. AR 2633. "Q: Did you have them do it on September 2nd? A: I can't say I had them do it on September 2nd, either. Because I think everybody is aware of what MACCS does, GovNet-NG does, and what UFMS does." *Id.*

Counsel for plaintiff persisted, asking Mr. Davis to examine relevant portions of the license agreements regarding support services offered under those contracts. This resulted in a string of answers admitting that, despite his insistence that daily on-site support was offered under the license agreements, various services were not covered by the support provisions of the license agreements:

> Q: But this says that their only obligation is to fix problems with the software they determine to be bugs or errors, isn't that correct?
>
> A: That's what this says, yes.
>
> Q: There's no obligation to support any use of GovNet with UFMS, is there?
>
> A: Is there obligation in here to support UFMS?
>
> Q: Yes.
>
> A: No, not stated here at all.

AR 2607. He further admitted that the daily support hours were different under each agreement, that the UFMS contract contained no debugging support requirements, that any further services other than debugging under the license agreements was subject to a further charge from Starry, i.e., not already paid for in the license agreements. *See* AR 2612, 2614-15.

On September 8, 2015, counsel for HHS informed GAO and Starry that it intended to cancel the solicitation rather than reevaluate Intellizant. Counsel emailed the following explanation:

> Specifically, it has been determined that two of the three systems proposed to be supported under the instant procurement were included in the solicitation by error. That is, both MACCS and GovNet-NG are the subject of separate license agreements with Starry Associates which allow the agency to make use of those proprietary systems. Included in those license agreements are support provisions; and, after review, the agency has determined that it better suits the government's needs to have the contract support and license agreements bundled together, rather than including the support function in a separate multi-faceted support contract. Indeed, my client informs me that the MACCS license agreement will be renewed before the end of September 2015, and the GovNet-NG license agreement was renewed in May 2015.

AR 1252 (email quoted in second GAO opinion). The agency thus concluded that it would "cancel the instant solicitation, redraft the statement of work to better match its current needs, and re-solicit in Fiscal Year 2016." *Id.*

On September 15, 2015, Starry filed its third protest at GAO, challenging HHS's decision to cancel the solicitation as a pretext so that Mr. Davis could secure the future work for Intellizant. Plaintiff argued that Davis decided to eliminate the requirements of the solicitation as to which Intellizant was unqualified and later to re-solicit the remaining work in order to avoid GAO's earlier recommendation to reevaluate, which Starry believes would have resulted in it winning the original procurement. GAO denied the protest by written decision on December 23, 2015, finding that the agency's proffered rational for cancellation was reasonable. Thus, even crediting the allegations of bias, the result was not affected, in GAO's view, because the "cancellation was otherwise reasonably justified." AR 1254.

Starry then filed suit in this court on January 11, 2016. On February 25, 2016, plaintiff moved to supplement the record with deposition testimony from the four individuals named below. After briefing and oral argument, we granted that motion and ordered that the depositions of Ms. Slater, Ms. Ellis, Mr. Joy, and Mr. Davis could be taken. Intellizant moved to intervene on May 3, 2016, and we subsequently granted that motion. The case is now ready for

disposition on cross-motions for judgment on the administrative record. During the pendency of the current protest, Starry has had its contract extended.

DISCUSSION

There are two issues presented by plaintiff: (1) whether the procurement is prejudicially tainted by bias, and (2) whether the agency was otherwise irrational in its decision to cancel the award on the basis of its purported revision of its need vis-a-vis MACCS and GovNet support. We find it unnecessary to resolve the first issue because we are satisfied that the agency was arbitrary and capricious in its cancellation of the solicitation.

We review agency actions taken in connection with a procurement pursuant to the deferential standards proscribed in the Administrative Procedures Act. 28 U.S.C. § 1491(b)(1)(4) (2012). The long-established standard in procurement challenges is whether the procurement decision "lacked a rational basis" or "involved a violation of regulation or procedure." *Impresa Construzsioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). It is essentially a standard of rationality. *See Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1368-69 (Fed. Cir. 2009). Thus our review is deferential to an agency's own consideration of its needs and its views of what bidders have offered. *See generally L-3 Commc'ns, Inc. v. United States*, 87 Fed. Cl. 656, 664 (2009) . So long as the agency "examines the relevant data and articulates a satisfactory explanation," we will not disturb its conclusions. *Gulf Grp. Inc. v. United States*, 61 Fed. Cl. 338, 351 (2004). Where the agency fails to undertake a review or fails to document such review, we must conclude that it acted irrationally. *See AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 370 (2009); *Nutech Laundry & Textile, Inc. v. United States*, 56 Fed. Cl. 588, 593 (2003).

I. The Agency's Decision To Cancel the Solicitation Is Unsupported

The record now contains a lengthy history of agency personnel being indifferent to the fidelity of the procurement process. Once the initial decision to award to Intellizant had been made, Ms. Ellis and Ms. Slater make clear that any other result was unwelcome and not seriously considered. Instead they viewed their task as bolstering the initial decision, and not reevaluation. The agency told GAO and Starry that it was undertaking a serious effort to follow the solicitation in reevaluating Intellizant's proposal consistently with the

PWS. But the record does not reflect such an effort. GAO came to the same conclusion in Starry's second protest.

Another instance of a cavalier disregard for the truth of representations made to the GAO was Mr. Davis' assurance that he was recused from the procurement process. In fact he remained directly involved in the selection of the TEP and ultimately made the critical decision to moot out the series of protests by cancelling the solicitation.

After losing at GAO, the agency considered its options generally but effectively eliminated any need to comply with its recommendation for reevaluation. Mr. Joy left to Mr. Davis the decision regarding the agency's course of action. He asked only for a rationale to support a decision to cancel the solicitation. Mr. Davis gave him one: HHS did not need support for MACCS and GovNet under both the UFMS contract and the license agreements for those two programs. Mr. Joy and his colleagues accepted that representation at face value in short order and conducted no independent analysis of the agency's needs. Thus, we are left to consider only the actions of Mr. Davis in this regard. His deposition leaves no question, however, that the rationale was completely illusory.

The contemporaneous record is devoid of any documentation wherein the agency's need for support for MACCS and GovNet as part of the larger UFMS system were considered by Mr. Davis or anyone else. The contemporaneous record is devoid of any communications between agency personnel regarding these needs outside of Mr. Davis' conclusion to cancel the solicitation as reported to Mr. Joy. We are left then with the declarations submitted to GAO and the depositions taken as part of this case.

The declarations of John Davis report only what was stated to Mr. Joy and provide no additional substance or support for the notion that an actual comparison of license agreements to the UFMS support contract was undertaken. We turn then to Mr. Davis' deposition testimony. It is telling.

Although he repeatedly assured Starry's counsel that he was aware of what was provided under each contract vehicle, he admitted that he did not compare the actual documents. When confronted with the language of the license agreements themselves, he agreed that they do not purport to provide support outside of troubleshooting and debugging. He also admitted that the daily hours of support are not the same under each contract. Thus, even assuming that the support called for under each contract was the same, the

actual hours procured would not be the same. The only fig leaf covering for his decision boils down to the fact that the word "support" appears both in the UFMS support contract and in the license agreements.

In stark contrast, the record contains a declaration submitted to GAO by plaintiff in support of its third protest. That declaration is made by a Starry's UFMS support contract project manager, a position that individual has held since 2009. He is personally knowledgeable about the support provided under that contract for the operation of MACCS and GovNet. He goes into considerable detail in 12 pages detailing the daily services provided for these systems under the UFMS support contract. He concludes that "The limited support services performed by Starry under the MACCS and GovNet-NG license agreements do not duplicate the support services provided the [UFMS support contract]." AR 1220. His reasoned and detailed statements stand unrebutted in the record.

In short, the record contains no basis on which the agency can pin the rationality of its decision to cancel. The conclusion is inescapable that the agency was arbitrary in its cancellation of the solicitation. It must therefore be set aside.

II. Injunctive Relief Is Appropriate

The court must consider a four factor test in deciding whether injunctive relief is merited in any case: (1) whether protestor has shown success on the merits, (2) whether protestor has shown irreparable harm absent the relief, (3) whether the balance of harms favors injunctive relief, and (4) whether it is in the public interest to enter an injunction. *PGBA v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). Plaintiff has shown that the agency acted arbitrarily in cancelling the award without any meaningful consideration of its needs. The first factor is met.

The government argues, as it often does, that pecuniary harm to the protestor is insufficient to establish irreparable harm. We disagree. There is no other meaningful remedy available absent an injunction. Plaintiff has no doubt invested considerable time and resources in fighting the agency's continued capricious conduct. Three protests at GAO, two corrective actions, and one law suit later, we are confronted with the loss of an opportunity to meaningfully compete for a contract and the resulting lost revenue. The agency has all but admitted that, if it had followed GAO's recommendation,

the award would have been made to Starry. This is enough, under these circumstances, to establish irreparable harm.

The balance of the harms also favors protestor. The agency has made no argument that it will not receive the services that it needs to support the UFMS if the cancellation is set aside. In fact, the idea that the agency wanted to cancel suggests the opposite. Starry is in place as the incumbent and has been performing under contract extensions pending the four protests.

We likewise find that the public interest favors an injunction. The government will not be harmed by any further delay and the public always has an interest in the integrity of the federal procurement system. *Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005).

We are thus left with only the question of how to tailor a remedy. The cancellation of the RFQ plainly must be set aside, leaving the procurement in the posture it was in after the second GAO protest. The options that the agency had open to it then remain on the table, although any reevaluation of Intellizant or cancellation of the solicitation will have to be consistent with the findings and holdings of this opinion. Specifically, if the agency chooses not to cancel, it must reevaluate Intellizant's offer consistent the recommendations of GAO and our findings here and make a new award to the next in line offeror if Intellizant is found to be technically unacceptable.

Further, given the performance of certain individuals involved at the agency, we will not permit Ms. Ellis, Ms. Slater, or Mr. Davis[6] to be involved in any subsequent agency actions regarding this solicitation.

CONCLUSION

Because the agency acted arbitrarily and capriciously in cancelling the solicitation, that decision will be enjoined. Accordingly, the following is ordered:

1. Plaintiff's motion for judgment on the administrative record is granted.

---

[6] We understand Ms. Ellis and Mr. Davis have since moved on from PSC, but that Ms. Ellis may have been rehired. If so, she will not be permitted to be involved.

2. Defendant's and intervenor's cross-motions are denied.

3. The agency's decision to terminate the procurement is hereby set aside and any further decisions with respect to contractual support for UFMS are to be consistent with this decision.

4. The Clerk of Court is directed to enter judgment accordingly. Costs to plaintiff.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge